**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0776n.06

No. 09-2356

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Nov 21, 2011*

LEONARD GREEN, Clerk

KEVIN D. SYKES,                               )
                                              )
    Petitioner-Appellant,                   )
                                              )
v.                                            )    ON APPEAL FROM THE UNITED
                                              )    STATES DISTRICT COURT FOR THE
HUGH WOLFENBARGER, Warden,                     )    EASTERN DISTRICT OF MICHIGAN
Macomb Correctional Facility,                 )
                                              )
    Respondent-Appellee.                    )
                                              )
                                              )

Before: KEITH, SUTTON and McKEAGUE, Circuit Judges.

SUTTON, Circuit Judge. A Michigan jury convicted Kevin Sykes of assaulting two Detroit police officers with the intent to murder them. The Michigan courts affirmed his conviction, and a federal district court denied his habeas petition. We affirm.

I.

Shortly before 2 a.m. on December 29, 2001, Detroit Police Lieutenant Vicki Yost responded to a report of a man carrying an assault weapon in a bar. When she arrived on the scene and spotted the gunman, she told him to drop the weapon; instead he sent a volley of armor-piercing bullets in her direction, hitting her in the right calf.

The shooter fled, and the police arrested several suspects. Before long, Kevin Sykes became the lead suspect, and over the next two days three officers participated in photo line-ups (Sykes was not yet in police custody). Yost and another officer identified Sykes as the shooter; a third officer identified a different man on the line-up sheet. Based on the identifications, a grand jury indicted Sykes for violating three criminal laws.

The jury found Sykes guilty on all counts. The judge sentenced him to 39–70 years for assault with intent to commit murder, two to seven years for being a felon in possession of a firearm and two years for possession of a firearm during the commission of a felony, all to be served concurrently.

Sykes appealed his conviction and sentence. The Michigan Court of Appeals affirmed, *People v. Sykes*, No. 245256, 2004 WL 2102010 (Mich. Ct. App. Sept. 21, 2004) (per curiam), and the Michigan Supreme Court denied leave to appeal, *People v. Sykes*, 696 N.W.2d 721 (Mich. 2005). The district court denied Sykes' petition for a writ of habeas corpus, *Sykes v. Wolfenbarger*, No. 2:09-CV-12146, 2009 WL 3199898 (E.D. Mich. Sept. 30, 2009), and refused to grant a certificate of appealability. On Sykes' motion, we granted a certificate of appealability on three issues: (1) whether the prosecution engaged in misconduct; (2) whether Sykes received ineffective assistance of counsel; and (3) whether testimony based on reports by officers not present at the trial violated Sykes' Confrontation Clause rights.

II.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), we may not grant the writ unless the state court decisions "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A.

In support of his prosecutorial-misconduct claim, Sykes points to the prosecutor's questioning of Adonis Davis about being approached by one of Sykes' relatives on the morning of the trial. This line of questioning, he charges, was designed to suggest Sykes intimidated several witnesses. But the trial judge, who saw the exchange first hand, detected no such implication. He instead found that the questions concerned Davis's willingness to testify, a contested point that went to Davis's credibility. The Michigan Court of Appeals agreed with the trial court's interpretation, *Sykes*, 2004 WL 2102010, at \*1, a decision that was neither an unreasonable determination of the facts nor an unreasonable application of Supreme Court precedent.

Sykes also objects to several questions by the prosecutor about whether Sykes intimidated Davis. But the questions came immediately after *defense counsel* asked Davis whether he was afraid of Sykes. The state court of appeals reasonably held that defense counsel opened the door to this line of questioning. *Sykes*, 2004 WL 2102010, at \*1. It is true that earlier in Davis's testimony, before

defense counsel had asked any questions about intimidation, the prosecutor asked whether Davis would be reluctant to "tell on somebody" after being threatened. But defense counsel raised no objection to these earlier questions, and Sykes made no mention of them in his direct appeal. The Michigan courts thus were denied any opportunity to consider the "factual and legal underpinnings" of a claim resting on the prosecutor's earlier questions. *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009). Even assuming such a claim could be made—and Sykes has failed to develop it at all, mentioning those earlier questions for the first time in a solitary footnote before our court without any accompanying explanation as to their significance, *see* Pet. Br. at 27 n.3—it is procedurally defaulted. *Pudelski*, 576 F.3d at 605.

Sykes adds that another question—asking whether Davis told the police about Sykes' being shot in a drug raid—amounted to prosecutorial misconduct. The Michigan Court of Appeals rejected this argument, holding that the question was relevant to the issue of Davis's credibility because Davis previously denied giving the police any assistance at all. *Sykes*, 2004 WL 2102010, at *1. Furthermore, it held, any prejudice from the question was minimized by the brief reference to it and the focus on Davis's interaction with the police, not the drug raid itself. *Id.* None of this was unreasonable, especially given that the jury already knew Sykes had previously been convicted of a felony. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

Sykes contends that the prosecutor improperly elicited testimony about Tyrone Moore's identification of Sykes as the shooter, "craft[ing] . . . questions to let the jury know that Moore had, in fact, identified" Sykes. Pet. Br. at 31. The admissibility of testimony about what Moore told the

police was hotly contested at trial, and the trial court, after hearing arguments from counsel, clearly delineated which questions were permitted and which questions were out of bounds. R.15, at 100–02. On this record, the prosecutor had only to abide by the limits set out by the trial court, which he did. *See Maness v. Meyers*, 419 U.S. 449, 459 (1975). The state courts reasonably rejected this claim.

Sykes also points to the prosecutor's statements about Sykes' attorney during closing arguments. Sykes raised no objections to the statements at trial, and Michigan's contemporaneous-objection rule limits appellate review to plain error. *See Sykes*, 2004 WL 2102010, at \*2. Because his failure to object to the statements prevented the state courts from reviewing the claim on the merits, it is procedurally defaulted. *See Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011). Nor has Sykes established cause and prejudice to excuse the default, principally because the prosecutor's comments were legitimately made in response to defense counsel's arguments. *See Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000).

## B.

Sykes' ineffective-assistance claims fare no better. He argues that his attorney was deficient in three respects: (1) he failed to object to the prosecutor's statements about defense counsel during closing argument; (2) he failed to move to suppress the photographic lineup; and (3) he failed to investigate and produce a potentially significant alibi witness. To succeed on any of these claims, Sykes must show that his attorney "made errors so serious that [he] was not functioning as the

'counsel' guaranteed . . . by the Sixth Amendment" and that those errors were "prejudicial"—that "there is a reasonable probability that, but for [those] errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984).

Sykes' first ineffectiveness claim is foreclosed by our discussion above. Because he failed to demonstrate prejudice from the prosecutor's closing argument that would excuse the procedural default of his prosecutorial misconduct claim, it follows that he cannot demonstrate the prejudice necessary to support his *Strickland* claim. If no prejudice flowed from the conduct in the one setting, it cannot establish prejudice in the other. *See Martin v. Mitchell*, 280 F.3d 594, 606 (6th Cir. 2002).

To prevail on the photo-identification claim, an attorney would have to show that the lineup "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). The Michigan Court of Appeals found no evidence that the officers based their identifications on the fact that his photo was different from the others, noting that the lineup attorney—whose job it was to protect Sykes' rights during the lineup—testified that the process was fair. *Sykes*, 2004 WL 2102010, at *6. The state court thus held that any objection to the identification evidence would have been futile. *Id.*

Reasonable disagreement with this conclusion, we acknowledge, is not beyond the pale. That none of the officers said they based the identification on the fact that the photo stood out as "goofy-looking," rather than a recognition of the suspect, is no guarantee that the difference was unimportant. Nor is the lineup attorney's opinion conclusive. But reasonable disagreement does not

suffice to overrule a state court conviction, and we cannot say that the state court was unreasonable. The evidence indicated that the officers' correct identifications were "immediate," suggesting that they recognized Sykes as the shooter and did not settle on the odder-looking photo simply because, as Sykes alleges, they could not recognize anyone. And while the court could not delegate the constitutional analysis to the lineup attorney, neither was it required to ignore the contemporaneous assessment of a legal professional whose job it was to protect Sykes' interests. On this record, we must respect the state court's conclusion that Sykes could not show a "substantial likelihood of irreparable misidentification," *Simmons*, 390 U.S. at 385, necessarily making the failure to object non-prejudicial. *See Krist v. Foltz*, 804 F.2d 944, 946 (6th Cir. 1986).

Sykes next argues that his attorney should have done more to secure the testimony of Sykes' friend, Dawnetha Washington, who allegedly would have said that Sykes was in West Virginia at the time of the shooting. The Michigan Court of Appeals rejected this claim, finding that Sykes' attorney and the investigator had tried to contact Washington, and that she did not respond to the messages left for her. *Sykes*, 2004 WL 2102010, at *5. The court also credited Sykes' attorney's testimony that, given Washington's failure to make herself available to testify on behalf of her friend, he was unwilling to subpoena her and run the risk that the testimony would backfire. *Id.*

Sykes questions the credibility of the testimony on which this conclusion was based. He points to inconsistencies in the post-conviction testimony of his trial attorney and the hired investigator about the steps they took to contact Washington. Were we hearing the case fresh, those arguments might be persuasive. But a federal court must "apply a presumption of correctness to

state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption." *James v. Brigano*, 470 F.3d 636, 643 (6th Cir. 2006). That deference extends not just to state trial courts but to state appellate courts as well. *See Treesh v. Bagley*, 612 F.3d 424, 430 n.1 (6th Cir. 2010). Here, the Michigan courts concluded, not unreasonably, that the fact that the investigator could not remember the details of the case roughly two years after trial did not mean his memory of having left a message for Washington—the key piece of evidence elicited from his testimony—was faulty. And they likewise determined that the attorney's later recollection of having left a message, though uncertain, was more reliable than his initial statement that he had not left one.

Sykes points out that in the past we have rejected state court determinations that an attorney had sufficiently investigated an alibi witness. *See* Pet. Br. at 39–41 (citing *Bigelow v. Haviland*, 576 F.3d 284 (6th Cir. 2009); *Avery v. Prelesnik*, 548 F.3d 434 (6th Cir. 2008); *Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007); *Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006)). But there is a wrinkle in this case missing from the earlier ones: the attorney's strategic determination that the difficulty in securing the witness's cooperation meant she was too risky to put on the stand. Washington knew that Sykes had been arrested and charged with a serious crime. If she had evidence establishing that he could not possibly have committed that crime because he was hundreds of miles away at the time, it is reasonable to suppose that she would try to help her friend—and at a minimum return phone calls about the case. But she made no such effort.

Under *Strickland*, defense counsel's "decision not to investigate [further] must be . . . assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. And because this is an AEDPA case, the bar is higher. It would not be enough for us to find, over that "heavy measure of deference," that the trial counsel's decision had been unreasonable. Rather, we must conclude that the state court was *itself* unreasonable in deciding that the defense attorney's decision was reasonable. *See Knowles v. Mirzayance*, 556 U.S. 111, 129 S. Ct. 1411, 1420 (2009). Sykes cannot overcome this double dose of deference. His attorney may not have performed the sort of "thorough investigation of law and facts relevant to plausible options" that makes a decision "virtually unchallengeable" under *Strickland*, 466 U.S. at 691, but we cannot say that the state courts were unreasonable in deferring to his conclusion—based on Washington's failure to respond to his calls or initiate contact herself—that she was a risky witness who might backfire.

C.

Sykes' last claim, grounded in his Sixth Amendment right to confront the witnesses against him, requires context. During his opening statement, Sykes' attorney told the jurors that "on the night in question . . . . [the police] arrested about 25 people. They arrested these people, these people, these people, just asking for whoever get[s] in trouble in the neighborhood. Then they want to come out, say, oh, well, now it's Kevin Sykes." R.13-3, at 101. During the trial, this became a theme of the defense: there were many suspects, and the police lacked a basis to determine that Sykes, rather than one of the other men, was the shooter.

Against this backdrop, the prosecutor asked Sergeant Vintevoghel, the officer in charge of the case, a series of questions designed to explain how the police settled on Sykes as opposed to the other suspects. Because Vintevoghel was not present at the scene and did not meet all of the suspects, his testimony relied on police reports written by other officers. In particular, Vintevoghel relied on the police reports to provide physical descriptions of Adonis Davis, Andre Hardin and Sylvester Gouge. (Sykes also argues that Vintevoghel relied on other officers' reports when he testified that Officers Senter and Taylor had eliminated Adonis Finney from the investigation. But that general statement—not the officers' description of Finney, just the fact that they eliminated him—was within Vintevoghel's personal knowledge as the officer in charge of the investigation.)

The Sixth Amendment generally precludes the admission of "testimonial" statements by parties who are not present at the trial. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Yet like most rules, this one has exceptions. One is that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n.9. This aspect of Vintevoghel's testimony, the state court found, was offered not for the "truth of the matters asserted therein, i.e., the descriptions of the suspects," but rather "for the purpose of identifying the factual information"—objectively verifiable because it primarily related to the height and weight of certain suspects—"on which the police relied in eliminating other suspects as part of their investigation." *Sykes*, 2004 WL 2102010, at *2. Defense counsel's argument was that the police investigation had been haphazard, rounding up assorted trouble-makers and then settling on Sykes without good reason. It was not unreasonable for the Michigan courts to admit responsive

evidence showing that the police had carried out the investigation in a more deliberate manner. True, there is a fine line between evidence admitted (permissibly) to show how the investigation proceeded and evidence admitted (impermissibly) to show that the investigation proceeded correctly. But in this case we cannot say that the Michigan Court of Appeals drew the line in an unreasonable way, and must therefore affirm the district court's denial of the writ.

Even if Sykes were right that Vintevoghel could not refer to the height-and-weight descriptions in the police report (and one description of a jacket), any error was harmless. In determining whether a habeas petitioner is entitled to relief because of a Confrontation Clause violation, we examine "whether the error had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The challenged evidence was an insignificant part of a robust case against the defendant. Lieutenant Yost testified during the trial that she was "absolutely [one] hundred percent sure, as sure as he is sitting here today, that that is the man that shot me." R.14-2 at 79. Another witness, Officer Senter, testified that immediately after the shooting he saw Sykes pointing the assault rifle at Yost. Adonis Davis, who knew Sykes, testified that Sykes was at the location of the shooting on the night it occurred. And other witnesses provided physical and clothing descriptions of the man carrying an assault rifle that night that matched Adonis Davis's description of what Sykes had been wearing.

In this context, the few pieces of challenged evidence would have been inconsequential. The physical description of Adonis Davis could hardly have affected the jury's verdict, because they saw Davis for themselves when he testified earlier in the trial. As for Hardin and Gouge: Aside from

the fact they were arrested that night, there was nothing to suggest they were responsible for the shooting. Because there was no reason for the jury to suspect them of wrongdoing in the first place, the reports showing that they physically did not match the description of the shooter would not have displaced any lingering doubts about Sykes' guilt. Accordingly, the only three pieces of evidence with respect to which Sykes has raised even colorable Confrontation Clause challenges could not have had any substantial effect on the jury's verdict.

III.

For these reasons, we affirm.