**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0220n.06

**No. 08-2269**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| BENJAMIN MCCOY, | ) | |
| | ) | **FILED** |
| Petitioner-Appellant, | ) | **Feb 24, 2012** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| KURT JONES, Warden, | ) | District of Michigan |
| | ) | |
| Respondent-Appellee. | ) | |

Before:    GIBBONS and SUTTON, Circuit Judges; and ADAMS, District Judge.[*]

ADAMS, District Judge.  Petitioner-Appellant Benjamin McCoy appeals the denial of his habeas corpus petition.  Because the district court made no error in its review, we affirm.

**I**

On June 4, 2000, Martel Wilson was shot and killed outside a Detroit club known as the Dance Factory.  At the time, Wilson was with two acquaintances, Hombre Foster and Quentin Leapheart.  Foster was also shot during the incident, but he survived.  As a result of the incident, McCoy was charged with one count of first-degree murder, two counts of assault with intent to commit murder, and one count of possessing a firearm during the commission of a felony.

In evaluating McCoy's direct appeal, the Michigan Court of Appeals analyzed McCoy's trial proceedings as follows:

---

[*]  The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

In his opening statement, defense counsel admitted that defendant, twenty-one years of age at the time of the offenses, shot the decedent, but indicated that he did so in self-defense.

At trial, Hombre Foster, the surviving victim, testified that he was upset with defendant, whom he personally did not know, because a few weeks before the shooting he was at the Dance Factory when defendant, without provocation, punched him. Defendant ran out of the club chased by Foster, Wilson, and Quentin Leapheart. Foster testified that on the night of the murder, he was again at the Dance Factory when he saw defendant. A short confrontation occurred, and defendant and his associates left the club. Thirty minutes later, Foster and Wilson went outside to meet Leapheart, who was driving them home. They got into Leapheart's car and waited for another friend. At this time, Foster saw defendant in a car which left and returned fifteen minutes later. One of defendant's friends approached Leapheart's car; he turned and went back toward defendant. Defendant then left his car, ran toward Foster and his friends and began shooting. Foster and Leapheart ran from the car: Leapheart escaped injury, Foster was struck by gunfire and Wilson was not so fortunate-he died as the result of five gunshot wounds.

Quentin Leapheart gave a similar account of the events on the night in question. He acknowledged that the decedent had a .25 caliber handgun in his jacket pocket, but left it in the car when he entered the Dance Factory. He testified that no one in his car fired a weapon at defendant.

Kenya Carter, a cousin of one of defendant's friends, testified that when she left the club on the night of the shooting, she saw defendant walk toward her in the direction of the victims' car, carrying a long black gun. After her cousin advised her to go back inside, Carter turned around and headed toward a building. According to Carter, defendant stated "You talking ____ " to the individuals in the car before she heard gunshots. Carter did not see anyone else shooting or with a gun.

The subsequent police investigation turned up ten fired cartridges at the crime scene; nine were fired from defendant's rifle and the tenth casing was fired from a different weapon. A police officer testified that when he reported to the crime scene, he saw a toy pistol on the back seat of the victims' car. The officer did not see a .25 caliber handgun in the car.

A Detroit Police Department investigator testified that defendant gave a custodial statement to her on August 3, 2000. In his statement, which was admitted into evidence at trial, defendant stated that a few weeks before the shooting he "got into it with some guys" while at the Dance Factory. On the night of June 3, 2000,

> defendant went to the club with two friends. There he saw the young man who was involved in the previous altercation. Defendant went out the back door and waited in the parking lot. Defendant then saw the young man with whom he had previously fought standing with his friends next to a car. Defendant stated that he heard someone say, "He got a gun." Defendant then returned to his own car, retrieved a rifle and ran back to "where the guys were." Defendant started shooting at the car. After firing five shots, defendant heard gunfire and started shooting again before he ran back to his car and drove away. Defendant estimated that he fired a total of seven to nine shots. Defendant claimed that he fired at the young men because his friend said "He got a gun." Defendant "got mad" and returned to his car to get his rifle. According to defendant, "I started shooting at them because I didn't want them to start shooting at us."
>
> At trial, no witnesses were called on behalf of the defense and the jury found defendant guilty as charged. Subsequently, following a hearing, the trial court denied defendant's motions for a new trial and an evidentiary hearing regarding his claims of ineffective assistance of counsel.

*People v. McCoy*, 2003 WL 21995222, at *1-2 (Mich. Ct. App. Aug. 21, 2003). The Michigan Court of Appeals went on to remand the matter for an evidentiary hearing on McCoy's claims of ineffective assistance of trial counsel. The appeals court also reversed McCoy's first-degree murder conviction, finding error in the trial court's jury instructions.

The State of Michigan then sought discretionary review by the Michigan Supreme Court. The Michigan Supreme Court accepted review, and on January 9, 2004, that court overturned the appellate decision and reinstated McCoy's murder conviction. Thereafter, McCoy pursued federal habeas relief under 28 U.S.C. § 2254.

In order to fully resolve the petition, the district court held a lengthy evidentiary hearing. Following that hearing, the district court found no support for McCoy's claimed errors. McCoy timely appealed and the matter now appears before this Court.

No. 08-2269
*Benjamin McCoy v. Kurt Jones*

## II

Generally, McCoy's petition is subject to review under the under the Antiterrorism and

Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), under

which a federal court may not grant a writ of habeas corpus unless the state court adjudication on the

merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 412-13

(2000), explained this standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Moreover, when evaluating the "unreasonable application" prong, a habeas court does not focus

merely upon whether the state court decision was erroneous or incorrect; rather, a federal court may

issue a writ of habeas corpus only if the state court's application of clearly-established federal law

was objectively unreasonable. *See id.* at 409-11. Finally, "[t]his court reviews a district court's legal

conclusions in a habeas proceeding *de novo* and its factual findings for clear error." *Greer v.*

- 4 -

*Mitchell*, 264 F.3d 663, 671 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999)).

McCoy has asserted that AEDPA's deferential standard of review is inapplicable because the state court did not have before it critical evidence that was later developed in a federal evidentiary hearing. McCoy is correct that his ineffective-assistance claims largely rely on evidence that was not in the state-court record. The Michigan Supreme Court denied McCoy's request for a post-conviction evidentiary hearing and dispatched his claims with one sentence: "Defendant... has failed to meet his burden of proving that defense counsel's actions were ineffective and were not a matter of trial strategy." *People v. McCoy*, 672 N.W.2d 853, 853 (Mich. 2004). Because the state courts did not give him an opportunity to introduce new evidence supporting his claims, the district court granted McCoy a federal evidentiary hearing, which was held in January 2008. McCoy argues that, because the Michigan Supreme Court rejected his claims without the benefit of the new evidence introduced in the federal hearing, it did not adjudicate his claims on the merits and therefore AEDPA's deferential standard of review, 28 U.S.C § 2254(d), does not apply. We previously accepted this very argument in *Brown v. Smith*, 551 F.3d 424 (6th Cir. 2008), where we reviewed the petitioner's ineffective-assistance claim under the pre-AEDPA standard of review: "*de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact" because the Michigan courts had refused his request for an evidentiary hearing. *Id.* at 429-30. The Supreme Court's decision in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), raises serious questions about *Brown*'s continuing vitality. In *Pinholster*, the Court held that habeas review of claims that are adjudicated on the merits by a state court "is limited to the record that was before the state court."

*Id.* at 1398. "[E]vidence introduced in federal court," the Court held, "has no bearing on ... review" of such claims. *Id.* at 1400. Whether *Brown* survives *Pinholster* need not detain us here, though, because McCoy's claims fail even if we consider the new evidence introduced in the federal hearing under the less deferential pre-AEDPA standard of review. *See Welsh v. Lafler*, 445 Fed. App'x 844, 849 (6th Cir. 2011).

## III

McCoy presents four questions for review. Each question, however, contains a common argument – that McCoy's counsel was ineffective. McCoy raises three claims that his trial counsel was ineffective and one additional claim that appellate counsel was ineffective. As the district court committed no error in resolving these issues, we affirm.

## IV

This Court has time and again explained the standard applicable for reviewing claims of ineffective assistance of counsel. In addressing these claims of ineffective assistance of counsel, we follow the two-part test laid out by *Strickland v. Washington*, 466 U.S. 668 (1984). As required by that analytical framework:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

In *Groseclose v. Bell*, 130 F.3d 1161, 1167 (6th Cir. 1997), discussing the first prong of the *Strickland* analysis, this Court held that:

> The [Supreme] Court cautioned that in undertaking an ineffective-assistance review, "[j]udicial scrutiny of counsel's performance must be highly deferential," and must avoid the "second-guess[ing of] counsel's assistance ..., [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. ... In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that ... the challenged action 'might be considered sound trial strategy.'"

*Id*. (citation omitted). Furthermore, in evaluating the prejudice prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Indeed, "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* (citation omitted). Rather, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

V

**1. TRIAL COUNSEL**

**A. Meaningful Investigation**

McCoy first claims that the district court erred when it failed to find merit in his claim that his trial counsel did not conduct a meaningful investigation. We disagree.

McCoy's first argument focuses upon a claim that his counsel failed to investigate after being informed that Robert and Roberto Carter would testify favorably on his behalf. In support, McCoy relies upon the Carter brothers' testimony at the evidentiary hearing. Reliance on this testimony is misplaced for several reasons.

First, there does not appear to be any dispute that counsel was told that the Carter brothers would provide favorable testimony. However, as early as August 30, 2000, counsel was also aware of the numerous unsuccessful attempts made by law enforcement officials to interview the brothers. During the hearing conducted that day, counsel was informed that neither Carter brother would appear. Additionally, counsel was aware that both Carters were on the prosecution witness list and that both had given statements to police that inculpated McCoy.

In essence, McCoy asserts that simply because he told his counsel that the Carters would offer favorable testimony, his counsel was obligated to investigate. The district court found no merit in this contention, nor does this Court.

In support of his claim, McCoy relies upon *Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007). *Ramonez* notes "that the investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation." *Id.* at 488 (citing *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)). This matter, however, is easily distinguishable from *Ramonez*. In finding merit to the claim in *Ramonez*, the Court analyzed the specific facts known to defense counsel as follows:

> But that argument is at odds with other crucial parts of the record. Months before trial Ramonez began insisting to Moore that the three witnesses were present at the time and could tell him what really happened at Fox's house. At the same preliminary

hearing on which Berghuis relies, Fox testified that Ramonez kicked in her door to gain entry to the house. Such asserted action was clearly not inside the house, such as to render the observers outside the house unable to verify or dispute the parties' divergent versions. Moreover, Fox also testified at that same hearing that three men witnessed the assault continue outside on her front porch (even stating that one of them assisted Ramonez by covering her mouth to keep her from yelling). If Moore was seeking to show that Fox was embellishing her story of the altercation with Ramonez, why would he not also have found it useful to look into this part of her tale? With such information available to him, how could he rationally have concluded that neither Charles nor Rene nor Hackett could possibly have anything to add to Ramonez's case?

*Ramonez*, 490 F.3d at 488.

Unlike counsel in *Ramonez*, McCoy's counsel had more than sufficient facts to determine that it would be fruitless to pursue investigating the Carter brothers' testimony. First, law enforcement had been repeatedly unsuccessful in securing an appearance by the brothers. Second, any statements favorable to McCoy would stand in direct contradiction of police statements previously given by the brothers. Thus, counsel had more than sufficient information to determine that it would be fruitless to pursue the Carter brothers and attempt to interview them. As such, the district court properly determined that McCoy had not satisfied the deficient-performance prong of *Strickland.*

Furthermore, the testimony offered by the Carter brothers during the evidentiary hearing demonstrated that McCoy also could not satisfy the prejudice prong of a *Strickland* analysis. First, as indicated above, the offered testimony directly contradicted prior statements made by the brothers to the police. Moreover, the district court properly noted as follows:

The Carters' testimony was suspect for additional reasons. Roberto Carter's testimony that gunshots came from the Dance Factory was contrary to the evidence at trial. Robert Carter's testimony that he heard gunshots before he saw Petitioner

with a gun conflicted with the evidence at trial and his own statement to the police. Furthermore, he claimed that he did not recall signing his affidavit, which was favorable to Petitioner.

Petitioner's testimony was contrary to the eyewitness testimony at trial and his statement to Investigator Simon. If the Court were to believe Petitioner, the Carters, and Ora Parker, the Court would have to conclude that everyone who testified at trial or during the due diligence hearing conspired to mischaracterize the facts.

R. 63 at 15-16. Because the Carters' testimony was inconsistent with their prior statements as well as the testimony of other witnesses, the district court's conclusion regarding the credibility of the Carters is not clearly erroneous.

Moreover, McCoy's current assertion that the Carters would have supported a claim that a third person was the shooter is likewise unhelpful to his failure-to-investigate claim. Such a statement would stand in stark contrast to the evidence that 1) McCoy admitted to firing numerous shots at the victims, and 2) that 9 of 10 shells recovered had come from McCoy's rifle. Thus, it can hardly be said that there is a reasonable likelihood that the result of the trial would have been different if counsel had investigated and offered any of the numerous theories offered for the first time by the Carters during the federal evidentiary hearing.

Based upon the above, assuming *arguendo* that counsel was deficient for failing to investigate, McCoy cannot demonstrate prejudice stemming from this deficiency. Accordingly, the district court properly found no merit in this ground for relief.

**B.  Testifying on his own behalf**

McCoy next argues that his counsel was ineffective for discouraging him from testifying on his own behalf. This argument suffers from a similarly fatal flaw.

During the evidentiary hearing, McCoy's trial counsel explained in detail why he advised his client not to testify on his own behalf. Counsel believed that self-defense could be presented through the testimony of the prosecution's own witnesses. Counsel also explained that McCoy had demonstrated a significant temper during trial preparation that counsel feared would appear on the stand and do significant damage to the claim of self-defense.

In support of the claim, McCoy testified that he would have told the jury that he had been fired upon before, during, and after the process of retrieving his rifle. Of course, this testimony again directly contradicts McCoy's own statement to the police and the physical evidence at trial. Such major discrepancies cast significant doubt over whether McCoy ever informed his counsel that his testimony would include these facts. However, assuming that McCoy told his counsel this information, counsel was still left with the decision over whether to encourage McCoy to testify knowing that he could be impeached by his prior statement and likely lose his temper under tough cross-examination. Given those facts, the district court did not err in finding that counsel's performance was not deficient.

Furthermore, the trial court adequately protected McCoy's right to testify. Counsel did not simply inform the Court that his client would not testify. Rather, trial counsel engaged in a colloquy directly with McCoy on the record to ensure that he was knowingly and voluntarily waiving his right to testify on his behalf. McCoy's self-serving testimony that he simply answered "Yes" to all of the questions in the colloquy because his counsel told him to is not sufficient to find his waiver less than knowing and voluntary. Accordingly, the district court did not err in rejecting this ground for relief.

## C. Motion to Suppress

With respect to his trial counsel, McCoy's final argument focuses upon his counsel's failure to file a motion to suppress. McCoy's claimed error focuses upon his assertions that during his custodial interrogation he was struck by an officer and that his repeated requests for counsel were ignored by officers. In this regard, the district court found that McCoy's counsel was credible when he testified that McCoy had never informed him of these facts.

The district court's credibility determination is fully consistent with the record and is not clearly erroneous. There is nothing to support McCoy's claim that his counsel simply ignored a viable suppression argument. Furthermore, given McCoy's consistently shifting testimony about his involvement in the events leading to his conviction, this Court agrees that McCoy's testimony lacked credibility. Accordingly, the district court committed no error in resolving McCoy's claims of ineffective assistance of trial counsel.

## 2. APPELLATE COUNSEL

With respect to his appellate counsel, McCoy claims ineffectiveness based upon the failure of his counsel to file a brief in opposition to the State of Michigan's request for discretionary review. This Court finds no error in the district court's conclusion that this alleged error was untimely pursued.

The AEDPA established a one-year limitations period for habeas petitions brought by prisoners challenging state-court convictions. 28 U.S.C. § 2244(d); *McCray v. Vasbinder*, 499 F.3d 568, 571 (6th Cir. 2007). The limitations period begins to run from the latest of four enumerated events. *See* 28 U.S.C. § 2244(d)(1). McCoy relies on the fourth of these events: "the date on which

the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

In finding this ground for relief to be time-barred, the district court noted as follows:

Petitioner contends that evidence supporting his claim was not available until July 14, 2007, when his current attorneys discovered that his appellate attorney prepared, but never filed, a response to the State's brief in the Michigan Supreme Court. Although Petitioner may not have discovered his former attorney's unfiled response until July 14, 2007, he appears to have known long before then that his appellate attorney did not file a response in the Michigan Supreme Court. He notes in his habeas petition that the State filed an application for leave to appeal in the Michigan Supreme Court and that his appellate attorney filed a motion for reconsideration after the state supreme court reversed the Michigan Court of Appeals. He also notes that the state supreme court's docket reflects his letter of inquiry about the case. It is obvious from these allegations that Petitioner had access to the Michigan Supreme Court's docket and knew what was filed and not filed in the case.

R. 63 at 7. On appeal, McCoy does not appear to challenge that he had knowledge for a significant period of time that his appellate counsel had failed to file a brief. Instead, on appeal, McCoy argues that while he "might have been able to find out in 2004 that his appellate attorney did not file a brief, he could not have known *why* his attorney did not file a brief." Appellant's Brief at 56.

In making such an argument, McCoy simply ignores the language of 28 U.S.C. § 2244(d)(1)(D). The AEDPA places a burden on McCoy to exercise due diligence to discover the factual predicate of his claims. McCoy knew years before his petition that no brief had been filed. His own complete failure to investigate the reason for that act does not satisfy his required due diligence. Accordingly, the district court committed no error in finding that this claim would be time-barred by the AEDPA statute of limitations.

**VI**

For the reasons described above, we **AFFIRM** the district court's denial of McCoy's petition.