# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LAWANDA KAY JENKINS,

        Defendant-Appellant.

UNPUBLISHED
March 15, 2018

No. 329846
Wayne Circuit Court
LC No. 15-004374-01-FH

---

Before: CAMERON, P.J., and SERVITTO and GLEICHER, JJ.

GLEICHER, J. (*concurring*).

I join the lead opinion in full. I write separately to elaborate on defense counsel's ineffectiveness and to explain why it prejudiced defendant Jenkins.

I

The events leading to Jenkins's prosecution began with an argument in Jenkins's new home. The antagonists, Jenkins and Daniel Stewart, share a son, DJ. DJ was eight years old at the time of the trial. Jenkins and Stewart quarreled relentlessly after their relationship ended. Not surprisingly, their versions of what transpired on the day in question differed dramatically.

Stewart testified that he drove his car to Jenkins's home to deliver some tools for DJ. He parked in the driveway, leaving his three-year-old son in the car. Jenkins allowed him into the house, he recounted, and he followed her to a back bedroom where she was folding clothes. An argument ensued. A man in the house rushed in and pushed him against a doorframe, Stewart claimed, and Stewart retreated toward the driveway. The man followed with a crowbar in hand and "bust out the back window of the car." Jenkins then picked up the crowbar, broke the car's front window, continued swinging the crowbar wildly, and struck Stewart's leg. Stewart drove away and called 911.

Jenkins, the only other witness at the bench trial, told an entirely different story. She maintained that Stewart arrived at her home unannounced and entered without permission. She came to the door and they proceeded to the back bedroom, where they bickered. Jenkins asked Stewart to leave and he started walking toward the front door. Before he got there, Jenkins recalled, he "snatches my purse and he runs out the house." Jenkins stood "stunned" for a moment, then ran after him. From her front porch she screamed to the neighborhood that "he stole my purse." A "guy" walked up and asked Stewart to return the purse, but Stewart threw it

in his car. The guy then struck Stewart's car window with a "long steel stick" and broke both the front and back windows. Jenkins ran into her home, called 911, and reported that she had been robbed. She denied that she struck Stewart or Stewart's vehicle and insisted that she never left her porch.

After Jenkins testified her counsel, Robert Simmons, announced, "[W]e've agreed to waive the testimony of [DJ] because it would have been cumulative and corroborative and also the other witnesses that were listed on the Defendant's witness list." In its entirety, Simmons's closing argument consisted of six words: "Question of fact, Judge, no argument."

Thus, the case submitted to the factfinder was a classic "he said/she said" credibility battle. Neither side called a neutral witness. No evidence other than Stewart's testimony inculpated Jenkins. And the court's verdict proved that the absence of corroboration was crucial to Jenkins' conviction.

The trial court found Jenkins guilty of assault with a dangerous weapon, reasoning:

As mildly as I can say it, . . . I don't believe the Defendant. The Defendant exhibits extremely high emotional [sic] or lack of control emotionally. She does that here in court and I imagine that she does that outside of this court.

She has a lot of ideas about why her actions are appropriate and somebody else's actions are inappropriate. But she does admit that she left the house and went to the porch. She does not admit that she went to the car, hit the car or hit Mr. Stewart with that crowbar, and I just simply don't believe it.

I believe that she did go to the car, that she did strike that car, that she did break the front windshield out, and that she did hit Mr. Stewart, Sr., with whatever the object was. And he says that it was a crowbar, she gives a description, but she doesn't admit or deny that it was a crowbar. So I am going to find her guilty of Count One.

Jenkins moved for a new trial, alleging ineffective assistance of counsel. The witnesses at the *Ginther*[1] hearing were Simmons and an eyewitness to the crime, Tawana McKnight.

Simmons recalled that Jenkins had given him the name of a nearby neighbor who witnessed the assault on Stewart's car. According to Simmons, Jenkins identified the neighbor as "Jawanda Jones." Jenkins also supplied Simmons with the witness's address and telephone number. Simmons claimed that he called the number and was told "there was no Jawanda Jones at that particular number." He made no further efforts to reach the woman. He did not go to the neighborhood. He did not send a letter to the address. He did not send an investigator to the neighborhood or to the address he had been given. Simmons summarized, "I was given the name and a phone number by Ms. Jenkins. Once the response I received was that no one by that name lived there . . . I did not go any further." And Simmons explained that he did not call DJ as a

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

witness at the trial because the trial judge had expressed that "it would not be good taste to have this boy testify against his father or be placed in the middle of this brouhaha."

Tawana McKnight testified that she had lived in her home for two years, but knew none of her neighbors. She recalled "a domestic violence confrontation" on a nice, spring day. She was sitting on her porch. Her attention was drawn directly across the street to Jenkins, who was screaming "he got my purse, he got my purse." Two other people also saw what happened; they were working on a car in McKnight's driveway. McKnight observed Stewart "jump into his car and back up into the street." One of the men working on the car, Donald Cunningham, went into the street with a crowbar and "threw the crowbar at his window" when Stewart tried to run him over. Cunningham picked up another object, McKnight recalled, and threw it at the back window. Both windows shattered.

McKnight described herself "a homemaker" who stayed at home most of the time. She did not recall receiving any phone call about the case, but vaguely recollected that someone may have left a business card at her home. She called the number back and left a message, but no one contacted her.

The trial court was not persuaded that Simmons had been ineffective, ruling that because Jenkins had provided Simmons with an incorrect name, "[t]he error is defendant's and is not imputed to her counsel." Failure to call McKnight did not deprive Jenkins of a substantial defense, the court continued, because Jenkins herself testified that someone else had perpetrated the crime and counsel "bolstered this theory in his closing argument."[2]

II

The lead opinion holds that by failing to make any effort to find McKnight beyond the unsuccessful telephone call, Simmons's representation fell below an objective standard of reasonableness. I agree. As the lead opinion elucidates, this was a credibility contest. A disinterested third-party witness who corroborated Jenkins's story likely would have made a difference in the outcome. In light of that rather obvious proposition, Simmons's lackadaisical investigative approach was unreasonable.

Like the trial court, the dissent places the blame for McKnight's nonappearance on Jenkins. The dissent observes that that while Jenkins had "no duty to investigate her own case," "it is unclear" why she "provided false information to her counsel" about someone who was home most of the time. The dissent concludes, "Trial counsel conducted a reasonable investigation considering he was provided the wrong name of the witness."

Actually, Simmons conducted *no* investigation after making a single telephone call. That, in a nutshell, demonstrates his constitutional ineffectiveness.

---

[2] The absurdity of the latter conclusion merits no further elaboration, as Simmons did not even come close to "bolster[ing]" his theory with a closing argument consisting of: "Question of fact, Judge, no argument."

A lawyer's duty to investigate his client's potential defense is well established. Contrary to the trial court and the dissent, that duty does not expire when a client provides information that turns out to be incorrect. An attorney must conduct a reasonable investigation even when the client is of no assistance at all.

The guiding principles come from *Strickland v Washington*, 466 US 668, 690-691; 104 S Ct 2052; 80 L Ed 2d 674 (1984):

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Under the circumstances and applying the "heavy measure of deference" due under *Strickland*, Simmons's failure to make any effort to find the neighbor who witnessed the incident was unreasonable.

Conducting an investigation into the circumstance of the crime is a core obligation of defense counsel. Mounting a defense without such an investigation is folly. Under governing constitutional norms, a lawyer's choice to limit the scope of an investigation "is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 691. I am at a loss to find an exercise of professional judgment in this case. Simmons did not testify (and the trial court did not find) that he stopped investigating for strategic reasons. He stopped because his client gave him an incorrect name. That is not a constitutionally sufficient reason to close down further investigative efforts. Overwhelming precedent supports my view; I have chosen only a couple of leading cases to make the point more cogently.

In *Rompilla v Beard*, 545 US 374, 387; 125 S Ct 2456; 162 L Ed 2d 360 (2005), the United States Supreme Court approvingly adopted the American Bar Association Standards for Criminal Justice in effect at the time that case was decided, which included "the duty . . . to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case . . . ." (Quotation marks omitted.) The Standard cited approvingly by the Court also provided, "The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." *Id*. (quotation marks omitted). These Standards guided the Court in that case, and refute any notion that Jenkins is to blame for Simmons's negligence.

The defendant in *Rompilla* was "uninterested in helping" counsel and expressed boredom when counsel tried to talk to him. *Id*. at 381. He was "even actively obstructive by sending counsel off on false leads." *Id*. None of this relieved counsel of the duty to investigate, however. The Court emphasized that the duty exists even when the client provides the lawyer no

assistance at all. And *Rompilla* provides a good example of why an attorney is not permitted to stop investigating when a lead fails to pan out. Counsel in *Rompilla* interviewed five of the defendant's family members and three mental health experts in preparation for the penalty phase of a capital punishment trial. The family members and even the defendant himself suggested that no mitigation evidence could be found. *Id*. at 381-382. Although Rompilla's lawyers had no reason to believe that they would find anything useful, the Court held that they were duty-bound to review other available evidence, including school, medical, and police records. This did not mean that counsel had to "scour the globe," the Court acknowledged. *Id*. at 383. But it did require the lawyers to review at least that which was readily available: Rompilla's prior conviction file. *Id*. The file was in the courthouse, and therefore easy to find. *Id*. at 384.

Eyewitnesses to the events in this case were equally easy to find; one lived directly across the street from Jenkins. *Rompilla*'s counsel undertook multiple efforts to find evidence of mitigation, yet the Supreme Court found them insufficient. Here, Simmons made a single unsuccessful phone call. No caselaw supports that because of his client's error, Simmons's subsequent professional default is excusable.

Our Supreme Court's decision in *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), involves finding an expert rather than an eyewitness, but its analysis is nonetheless pertinent and analogous. Defense counsel in *Ackley* consulted a single expert witness who proved unhelpful and hostile to the defendant's scientific argument. The expert suggested that another physician might be more likely to testify on the defendant's behalf. *Id*. at 385-386, 390. Despite this information, defense counsel stopped investigating. *Id*. at 386. The Supreme Court found counsel's minimal effort unreasonable, as "counsel did no consultation at all beyond settling on the very first expert he encountered, despite the importance of expert medical testimony in the case and despite that expert's specific recommendation to contact a different and more suitable expert." *Id*. at 392.

*Rompilla* and *Ackley* instruct that a bump in the investigatory road does not reasonably excuse abandoning the effort. Against this legal backdrop, I am unable to accept that counsel's single telephone call satisfied his duty to investigate. In *Strickland*, 466 US at 688, the United States Supreme Court refrained from crafting "a checklist for judicial evaluation of attorney performance," or a "particular set of detailed rules for counsel's conduct." There can be no doubt, however, that an attorney has a duty to investigate a client's cause that includes seeking and interviewing eyewitnesses to a crime. This is a most elementary step, particularly when the remaining evidence otherwise hinges on testimony fraught with personal conflict and emotional baggage.

That Jenkins provided Simmons with an incorrect name was not a reasonable or legally acceptable excuse for Simmons's decision to do nothing more. Taking Simmons at his word, he failed to follow up with Jenkins by asking her to clarify the neighbor's name. He failed to inquire of the person who answered the phone if she lived in the neighborhood. And he failed to send an investigator to the neighborhood to locate any eyewitnesses, not limited to McKnight. Certainly Simmons's decision to stop investigating cannot be chalked up to trial strategy. No good lawyer would consider eyewitness testimony unhelpful or unnecessary in a case like this.

In another analogous case the federal Court of Appeals for the Sixth Circuit put it quite plainly: "An attorney's duty of investigation requires *more* than simply checking out the witnesses that the client himself identifies." *Bigelow v Haviland*, 576 F3d 284, 288 (CA 6, 2009) (emphasis added). In *Bigelow,* the defendant initially provided counsel with the names of several potential alibi witnesses, but none could remember where Bigelow was on the day of the crime. *Id*. at 287. Bigelow himself wrote letters to other possible witnesses. Four days before trial, one (Greenlee) responded with helpful information. Counsel "did not search for any other individuals who were present . . . to obtain corroborating testimony." *Id*. Only Greenlee testified at the trial.

The Sixth Circuit discerned "no reasonable explanation for [counsel's] unwillingness to do more after learning that Greenlee could testify in support of Bigelow's defense." *Id*. at 287-288. Had counsel conducted "even minimal additional investigative steps," the Court declared, other witnesses would have emerged. *Id*. at 288 (quotation marks omitted). Counsel's "failure to take even these minimal steps to corroborate" the alibi defense "was objectively unreasonable," the Court held. *Id*.

I respectfully take issue with the dissent's contention that Simmons's submission of a repair receipt for the motorcycle dated weeks before the incident, a police report on the purse, and a locksmith's invoice served as sufficient substitutes for eyewitness testimony. None of these documents contradicted Stewart's version of events. None altered the fundamental character of this case; it still boiled down to Stewart's word against Jenkins's. It should have been clear to Simmons that the testimony of a disinterested witness would be crucial to his client's success at trial.[3] Indeed, had McKnight testified, it is entirely possible that Jenkins would not have had to, avoiding the "lack of control emotionally" criticized by the trial court. I cannot fathom how a single brief phone call sufficed as a reasonable investigation of this case, especially since a visit to the neighborhood would have involved only a minimal effort.

III

Was Jenkins prejudiced by Simmons's failure to call McKnight? I address this issue because the trial court stated that it had made a "credibility determination" that would "not be disturbed" by "this post-conviction motion." Notably, the trial court did *not* hold that McKnight's testimony would have been irrelevant or rejected. In a *Strickland* case in which there has been a bench trial, the proper question is whether a reasonable factfinder would likely have reached a different verdict. "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies [sic] of the particular decisionmaker, such as unusual propensities toward harshness or leniency." *Strickland*, 466 US at 695.

*Strickland* further instructs that a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. at 693. Rather, a defendant

---

[3] Jenkins's son was also a readily available eyewitness. The record does not tell us what he would have said. Nevertheless, the trial court's belief that "it would not be good taste to have this boy testify" should not have foreclosed Simmons from calling the child.

need show only a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

This was a credibility contest. The relative credibility of Jenkins and Stewart were central to the outcome. The exculpatory testimony of an independent eyewitness easily gives rise to reasonable probability that an impartial factfinder would have found reasonable doubt and acquitted Jenkins.

Because Simmons unreasonably failed to conduct a meaningful investigation in this case and his ineffectiveness prejudiced Jenkins, I join the lead opinion in full.


/s/ Elizabeth L. Gleicher