NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0325n.06
No. 19-5407

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JAMES CARR POTTER,                      )
                                        )
        Petitioner-Appellant,           )
                                        )
v.                                      )    ON   APPEAL   FROM   THE
                                        )    UNITED  STATES  DISTRICT
JAMES DAVID GREEN, Warden,              )    COURT  FOR  THE  WESTERN
                                        )    DISTRICT OF KENTUCKY
        Respondent-Appellee.            )
                                        )
                                        )

BEFORE: MOORE, SUTTON, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Petitioner-Appellant James Potter appeals the district court's denial of his petition for a writ of habeas corpus, arguing that his trial counsel was ineffective in failing to investigate exculpatory evidence. We AFFIRM.

**I.**

Following a jury trial in Kentucky state court, Potter was convicted of numerous charges of sexual abuse against a minor victim, JA, whom Potter frequently babysat. JA was born on December 16, 1994. The indictment alleged that Potter committed the twenty-six charged offenses between July 2002 and May 2008. The evidence against Potter primarily consisted of JA's testimony, evidence that JA's DNA was present on sex toys found in Potter's house, and medical evidence. Relevant here, Potter was convicted of one count of first-degree sodomy, and one count of first-degree rape, both resulting in life sentences. The first-degree-rape instruction required the jury to find that Potter "engaged in sexual intercourse with [JA] by inserting the purple vibrator

with bunny into her vagina" and that "at the time of such intercourse, [JA] was less than 12 years of age." Dec. 17, 2018, Hr'g Ex. 1, Jury Instruction No. 6; *see* R. 35, PID 796.

On direct appeal, the Kentucky Supreme Court affirmed Potter's convictions in relevant part.[1] Potter filed a pro se motion in state court seeking post-conviction relief, arguing in part that his counsel was constitutionally ineffective for failing to obtain "itemized store receipts" that would have shown that "specific 'sex toys' in this case were not purchased by [Potter] until after the alleged victim's 12th birthday." R. 7-2, PID 371. The state court denied Potter's motion without an evidentiary hearing. The Kentucky Court of Appeals affirmed, reasoning that Potter failed to comply with a procedural rule requiring the movant to "state specifically the grounds on which the sentence is being challenged and the facts on which the movant relies," Ky. R. Crim. P. 11.42(2), because Potter did not attach the store receipts to his motion or otherwise establish that the receipts exist. The Kentucky Supreme Court denied discretionary review.

Potter then filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, raising three claims for relief, including an ineffective-assistance-of-counsel claim based on trial counsel's failure to investigate when Potter purchased the purple vibrator (the "relevant ineffective-assistance claim"). The magistrate judge issued a report recommending that all three claims be dismissed and that no certificate of appealability be granted. On the relevant ineffective-assistance claim, the magistrate judge found that the claim was not exhausted, was otherwise procedurally defaulted, and lacked merit. However, the district court found that Potter had presented his claim to the state court and complied with Rule 11.42(2) by specifically setting forth the factual and legal basis for his ineffective-assistance claim. Therefore, the district court concluded that Potter's claim is not procedurally defaulted. On the merits of the claim, the district court found that the

---

[1] The Kentucky Supreme Court reversed other convictions on Double Jeopardy grounds, but those counts are not relevant to this appeal.

-2-

record was insufficient to determine whether trial counsel was ineffective and, because the state court had not decided the claim on the merits, ordered an evidentiary hearing.

Potter called five witnesses at the evidentiary hearing: Carolyn Keeley, his trial counsel; Brent Haire and Peggy Bridges, Keeley's investigators; Frank Gruber, the post-conviction investigator; and Potter. Numerous exhibits were also admitted, including Keeley's case file.

Keeley is an experienced attorney who at the time of her representation of Potter had previously worked as a public defender, prosecutor, directing attorney at a public defender's office, and private attorney. When she represented Potter, Keeley was a staff attorney in the public defender's office. She testified that Potter was a very engaged client and that she was very careful to follow through on the many leads he suggested. She did not recall whether her team discussed when Potter had obtained the toys and did not remember Potter ever telling her where he bought the sex toys. But she did recall discussing and investigating "receipts with regard to his travel and where he might have been on a particular day." R. 35, PID 749. She also testified that, "I can't imagine that there was any element in this trial, any possibility in these scenarios that wasn't discussed, because, I mean, every little thing -- I remember that. Every little thing that could possibly be poked into was brought up by somebody, and certainly [Potter] did." *Id.* at PID 748.

Keeley explained that the trial strategy was to pursue an absolute defense that Potter never abused JA. Part of that strategy involved presenting a potential motive for JA to lie, and she recalled pursuing potential leads to establish such a motive. When asked about arguing in favor of lesser-included offenses rather than focusing solely on an absolute defense, she explained:

> Well, other than when you're in chambers arguing or discussing with all parties what the instructions are going to be, when you have a defense of "I absolutely didn't do it," it is usually a bad idea psychologically to do the -- you know, tell the jury, "He absolutely didn't do it, but if he did, then it should be a lesser offense." That's not usually good strategy. And other than that, I don't

recall. I mean, I would have a hard time using that as a strategy at trial. The client would have to give permission to make an admission of a lesser.

*Id.* at PID 750.

Haire testified that he met with Potter many times and agreed that Potter was very engaged in the case. Although Haire received assignments from Keeley about the case, Keeley also gave him leeway to follow any lead he thought necessary. Haire did not recall being instructed to obtain sex-toy receipts and did not obtain those receipts. Haire identified an exhibit as notes that he took in Potter's case, which included notes stating, "[k]nows when he bought the toys," and "[m]atch description with toys." *Id.* at PID 756-57. Haire testified that the notes were "probably a list of things that either Mr. Potter was listing off or maybe Ms. Keeley was listing off of things involving the case." *Id.* at PID 757.

Bridges testified that she also met with Potter at least several times before trial. Regarding whether she recalled being asked to obtain bank records or store receipts, she stated:

> I can't believe that we didn't get some kind of records, the bank records and -- if I remember correctly -- and, again, this has been nine years ago -- I would have -- I think that I talked to Mr. Potter and asked him where he got those toys, if he remembered where they came from, when he got them, how he paid for them. And to the best of my recollection, he either didn't remember where he bought them or didn't know how he paid for them or didn't remember when he got them.
>
> As to the bank records, I can't believe we didn't get bank records. And for some reason, I want to say we did, and I just don't remember seeing where anything had been purchased that would have kicked off a -- you know, me saying, "Oh, this is where that came from."

*Id.* at PID 763.

Gruber testified that Potter's credit-union records showed purchases from two stores that sold sex toys: Tammy's, from December 29, 2006, and the Lion's Den, from March 2008. Through his investigation, Gruber was able to obtain a copy of the receipt from the Lion's Den, which had a description of the items that Potter purchased that day. None of the descriptions

matched the purple vibrator. Gruber, however, was unable to obtain the December 29, 2006, receipt from Tammy's because receipts from that time period were no longer available. Tammy's only keeps records for six years, meaning that the December 29, 2006, receipt would have been available if requested prior to 2012. Because Potter's trial was in 2010, the receipt would have been available had it been requested at any point before trial. On cross-examination, Gruber admitted that he did not "have any idea when the purple bunny vibrator . . . was purchased," and did not know which sex toys Potter owned prior to December 2006. *Id.* at PID 795.

Potter testified that he bought the purple vibrator from Tammy's on December 29, 2006, as part of a bundle of toys for JA's mother's friend, with whom he had a sexual relationship. He also testified that he obtained his credit-union records and tried to show them to Keeley because the records established when he purchased the sex toys and where he was on certain dates, but she refused to look at them. Further, he detailed many other examples that he believed established that Keeley and her investigators performed poorly in this case. However, he admitted that, in declining to testify at trial, he told the trial court that there was nothing he could testify about because the allegations were so vague, although he explained at the evidentiary hearing that he made that statement due to advice of counsel. He also acknowledged that he was not told by the credit union that he needed to obtain the receipts directly from the Lion's Den and Tammy's until after trial.

Following supplemental briefing, the district court found that Potter failed to establish deficient performance or prejudice. After summarizing the testimony and documentary evidence, the district court found Keeley's testimony to be credible and concluded that Potter did not establish deficient performance because (1) he never testified and there was no documentary evidence supporting that he told Keeley to seek receipts from Tammy's to show that the purple

vibrator was purchased after JA's twelfth birthday; (2) Keeley used two investigators that reasonably followed potential leads, and there was no evidence that Keeley only investigated leads suggested by Potter; and (3) the evidence was insufficient to rebut the presumption that Keeley's trial strategy was reasonable. The district court concluded that Potter did not establish prejudice in part because it was speculative that a receipt from Tammy's would have shown that he purchased a purple vibrator after JA's twelfth birthday, and even if it did, it was speculative to conclude that such a receipt might have impacted the verdict given the possibility that Potter could have purchased a similar vibrator prior to that date.

Accordingly, the district court denied the relevant ineffective-assistance claim. Although the district court "fe[lt] strongly that Keeley's testimony was credible" and stated that "it appears that [Potter] is attempting to retry all issues on the basis of evidence and investigation he wishes he had requested at or before trial," the district court granted a certificate of appealability on the relevant ineffective-assistance claim "[o]ut of precaution." R. 47, PID 949-50.

Potter appealed, and we declined to expand his certificate of appealability beyond the relevant ineffective-assistance claim.

**II.**

The district court found that Potter's claim is not procedurally defaulted and that the state courts did not consider Potter's claim on the merits. Accordingly, the district court reviewed Potter's claim under the standards preceding the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. The Warden does not contest the district court's conclusions on these points, and because we agree with the district court, we likewise apply the pre-AEDPA standard and review the district court's legal conclusions de novo and its factual findings for clear error. *Hand v. Houk*, 871 F.3d 390, 408 (6th Cir. 2017).

A petitioner alleging ineffective assistance of counsel must show that "(1) his counsel's performance was deficient, or put differently, 'fell below an objective standard of reasonableness'; and (2) the performance prejudiced the defendant." *United States v. Mahbub*, 818 F.3d 213, 230-31 (6th Cir. 2016) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. The reasonableness of an investigation decision "may be determined or substantially influenced by the defendant's own statements or actions" because "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Id.* However, "[a]n attorney's duty of investigation requires more than simply checking out the witnesses that the client himself identifies." *Bigelow v. Haviland*, 576 F.3d 284, 288 (6th Cir. 2009).

Potter argues that trial counsel's failure to investigate the purchase date of the purple vibrator was unreasonable, particularly after Potter obtained his credit-union records showing purchases from adult stores after JA's twelfth birthday and alerted Keeley's investigators to this lead. On this record, however, and considering the district court's factual findings, Potter has not met the high bar to establish that Keeley's performance fell outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

The district court found that Potter never alerted Keeley or her investigators of the need to investigate the purchase date of the purple vibrator or that he purchased the purple vibrator from

Tammy's after JA's twelfth birthday, but was instead attempting to raise issues he wishes he had raised before trial.[2] We find no clear error in this finding. Bridges testified that she "think[s she] talked to Mr. Potter" about "where he got those toys, [and] where they came from, when he got them, how he paid for them," but "he either didn't remember where he bought them or didn't know how he paid for them or didn't remember when he got them." R. 35, PID 750. This was consistent with Keeley's testimony that she and her investigators were diligent in following every lead provided by Potter. It is also consistent with memos in Keeley's trial file. In one memo apparently written by Keeley before trial, she notes that Potter told her about bank records and employment records he wanted to use to show that he was not around the victim during the relevant times. Although she did not think that Potter's leads were promising, she nevertheless instructed Haire to investigate this evidence.

Further supporting the district court's factual finding are the letters that Potter wrote to Keeley and her investigators, both before and after trial, and Keeley's memos to file, which never mentioned investigating the purchase records from Tammy's. The only letter that even pertains to purchasing sex toys is a letter from October 29, 2009, where Potter informs Keeley that he obtained his credit-union records and says that he "can show when [he] made purchases from adult stores and ammount [sic] spent." R. 39-3, PID 887. He continues:

> (Might we use this to refute claims by girl – she stated that only used 3 [t]oys the whole time and I never got new ones.) You can tell the old toys from the new, in fact I believe several still have the 'test' batteries in them by Lion's Den. (Pink has no batteries, went dead first time I tried using it and I opened to find batt corroded.) I think I may have figured out how I may have contaminated the pink toy – [h]ad to use mouth to bite end and unscrew to get batteries out. May even be tooth marks on it. Would [a]dult store keep security video this long? (Year++) Register camera

---

[2] The district court noted that at one point during Potter's testimony when asked about the relevancy of DNA results, he stated that he "told them if you got the receipts in a timely manner, [Potter] could account for each item in the bag." R. 47, PID 945 (internal quotation marks and citation omitted). But the district court found that this statement was too general as to whom Potter told and when, and that other evidence suggested that Potter was not even aware that he needed to inquire directly with Tammy's to obtain itemized receipts until after trial.

should show purchases; red one, clear one and Ben Wa Balls (1 set). (March 7, 2008)

*Id.* at PID 887-88.  Potter did not mention the purple vibrator or records from Tammy's in this letter.[3]  Further, Potter was highly critical of Keeley's performance after trial, but his letters do not fault her for failing to investigate the purchase date of the purple vibrator or any other sex toys.

Although counsel should investigate beyond leads provided by the defendant, competent counsel would not necessarily investigate this type of purchase—where it is possible, for example, that Potter paid in cash or that he purchased a similar vibrator earlier—without some indication that the facts would be ascertainable and potentially helpful and without some guidance from the client as to where to look.  *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." (citations omitted)); *cf. Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) ("It is particularly unreasonable to fail to track down readily available and likely useful evidence that a client himself asks his counsel to obtain." (citing *Bigelow*, 576 F.3d at 287-88)).  These circumstances distinguish Potter's case from the cases he cites finding deficient performance based on an inadequate investigation.  *See Wiggins v. Smith*, 539 U.S. 510, 525-26, 533 (2003) (capital counsel unreasonably stopped investigating the defendant's social history to present as mitigating evidence at sentencing hearing even after uncovering evidence that this line of inquiry could be fruitful); *Poindexter v. Booker*, 301 F. App'x 522, 528-29 (6th Cir. 2008) (finding deficient

---

[3] Although not brought to our attention by Potter, our review of Keeley's case file uncovered other references to "descriptions of toys that [Potter] did not own then," apparently written to brainstorm ways to discredit JA's testimony. *See, e.g.*, Keeley Case File, potter003.pdf at 48.  This is similar to Haire's notes stating, "[k]nows when he bought the toys," and "[m]atch description with toys."  R. 35, PID 756-57.  However, nothing establishes that Keeley and her investigators failed to investigate any potential leads of which they were aware, and Haire testified that he was not sure where this suggestion came from and did not think he was ever instructed to obtain purchase receipts.

performance where counsel failed to investigate or call two alibi witnesses who "both personally offered to provide testimony beneficial to [the defendant]").

Potter attempts to sidestep the district court's factual finding by arguing in his reply brief that he did not know that the vibrator he allegedly used on JA was purple, suggesting that had Keeley investigated further she would have been prepared to discredit JA's testimony that Potter penetrated her with the purple vibrator. Potter did not explore this issue below and cites no record evidence to establish that he was unaware that a purple vibrator was discovered in the bag seized by police. Further, materials in the record show that Potter was aware of the statements JA made in interviews where she identifies multiple vibrators of different colors—including a purple vibrator.[4]

Finally, Potter asserts that Keeley's trial strategy to focus on an absolute defense was deficient. Although Potter acknowledges that Keeley argued in her closing statement that the jury should find that, even if it believed that the sexual abuse occurred, the relevant acts were not committed until after JA turned twelve, he says that Keeley made that argument without conducting the necessary investigation of store receipts to support that argument with evidence. We disagree.

---

[4] Although not discussed by the parties, we also note that it appears that Keeley did not know that the purple vibrator would play such a prominent role in this case until the middle of trial. JA stated in interviews that Potter used multiple vibrators and other nondescript toys on her. Further, multiple vibrators were tested and found to contain JA's DNA. The original indictment initially charged Potter with three separate counts of first-degree rape and four separate counts of first-degree sodomy, each of which could have carried a life sentence if convicted. The first-degree-rape counts in the indictment did not allege that any sex toys were used in the commission of the rapes. After the state concluded its case-in-chief, it moved to amend the indictment, which effectively merged the first-degree-rape counts into one, and specified the sole remaining first-degree-rape count would be based on the use of the purple vibrator. Thus, it appears that the contours of the state's case were not even clear until after JA testified at trial. Even assuming arguendo that in a normal case counsel would be deficient in failing to investigate the purchase date of an instrument where counsel knows that the purchase date of that specific instrument would determine the severity of a potential sentence, in this case, it is somewhat more understandable not to focus on one specific vibrator and instead focus primarily on an absolute defense given the vagueness in the initial allegations and the fact that there were multiple sex toys initially alleged and multiple counts carrying a potential life sentence.

Keeley testified that she focused on an absolute defense and thought that, in general, arguing in favor of a lesser-included defense is bad strategy, but Keeley's case file shows that she did not decide to ignore potential alibi evidence that would have strengthened an argument for a lesser-included offense. One of the difficult issues in Potter's case that Keeley documented in her case memos and in her testimony at the evidentiary hearing was the lack of specificity in the allegations, which was not unexpected given the age of the child and the duration of the alleged abuse. As she explained in contemporaneous memos, this challenge, among others, led Keeley to believe that an alibi defense would be difficult and that she would do more harm than good in pursuing it. But she nevertheless wrote that she would present any strong alibi evidence she could obtain for any specific instance. Having not located any strong alibi evidence after a reasonable investigation, Keeley's decision to argue in favor of lesser-included offenses based on JA's credibility and inconsistencies in her testimony was not unreasonable.

In sum, mindful that our review of Keeley's "performance must be highly deferential" and that we should resist the temptation to second-guess an attorney's strategic decisions after an adverse verdict or sentence, Potter has not overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Given the vagueness and breadth of the allegations against Potter, the multiple sex toys alleged to have been used that contained JA's DNA, the lack of any clear direction from Potter that a purple-vibrator receipt was ascertainable and potentially exculpatory, the evidence that Keeley and her team investigated any potential leads, and the deference we owe to trial counsel's strategic decisions, Potter has not shown that Keeley's investigation or strategy was unreasonable. Because Potter has not met the deficient-performance prong of the *Strickland* test, we need not consider whether Potter established prejudice. *Id.* at 697, 700.

## III.

For the reasons set out above, we affirm the district court's judgment.